UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DANIEL RYAN<br>3038 St. Paul Street, Apt. 1<br>Baltimore, MD 21218<br><br>Plaintiff,<br><br>-against-<br><br>ASHLYN BROOKE ANDERSON<br>448 E. 28th Street, Floor 2<br>Brooklyn, NY 11226<br><br>Defendant. | : | Civil Action No. _____________<br><br>**COMPLAINT** |

For his Complaint against Defendant **Ashlyn Brooke Anderson**, Plaintiff **Daniel Ryan**, by his undersigned attorney, upon knowledge as to his own actions and dealings, and upon information and belief as to Ms. Anderson's actions, alleges as follows:

## NATURE OF THE ACTION

1. This case concerns the malicious, destructive actions of Ms. Anderson, who defamed Mr. Ryan with an outrageous lie that he assaulted her during a consensual encounter seven years earlier. She communicated these and other lies to Mr. Ryan's business partners and friends in a calculated attempt to destroy his career, ruin his reputation, and cause him substantial emotional distress.

2. Ms. Anderson, an actress and singer, and Mr. Ryan, a professional musician, met on a musical theater project in September 2018 in Utah.

3. They developed a friendship that included a one-time sexual "hook-up" between consenting adults, although Ms. Anderson lied about her age at the time, telling Mr. Ryan she was 25 when she was actually 23. At the time, Mr. Ryan was 28.

4. Immediately following that encounter, Ms. Anderson had lunch with Mr. Ryan, remained close with him for the duration of their time in Utah, and expressed regret that he was leaving.

5. Several weeks later, she visited Mr. Ryan while he was performing at a concert and continued to try to cozy up to him.

6. Although Mr. Ryan continued to communicate with Ms. Anderson, he was not interested in the romantic relationship that she appeared to desire because, as he informed her from the outset, he already had a serious girlfriend.

7. When word got back to Mr. Ryan that Ms. Anderson had told a mutual acquaintance about her having slept with Mr. Ryan in Utah and what a "great guy" he was, Mr. Ryan confessed to his girlfriend what had happened in Utah, and thereafter informed Ms. Anderson that they needed to sever all ties.

8. Mr. Ryan did not hear from Ms. Anderson again until *almost six years later* when she sent unsolicited messages to representatives of at least three bands of which Mr. Ryan was a member, falsely accusing him for the first time of assaulting her during their consensual hook-up in Utah. She falsely claimed Mr. Ryan was "much older than" her at the time, had "power" over her, and had "emotionally manipulat[ed]" her.

9. She also sent an unsolicited message to Mr. Ryan's girlfriend with similar untruths.

10. Prior to her string of attacks, Ms. Anderson had never made any such claim to Mr. Ryan or anyone else to his knowledge during the almost seven years since the Utah encounter. She never pressed charges or took any action to even suggest that she had been the victim of an assault. To the contrary, all of her actions indicated a desire for a closer, ongoing relationship with Mr. Ryan.

11. Ms. Anderson's out-of-the-blue campaign of attacks was designed to destroy Mr. Ryan's career, professional and personal relationships, reputation, and overall well-being.

12. Unfortunately, her actions did just that because bands she contacted cut ties with Mr. Ryan unless and until he could hold Ms. Anderson accountable. Her actions have also caused Mr. Ryan severe emotional distress.

13. Although Mr. Ryan sought a retraction, cease-and-desist agreement, and further steps to repair the harm she caused, Ms. Anderson refused.

14. As a result, Mr. Ryan was left with no choice but to initiate this action against Ms. Anderson for defamation and wrongful interference with contractual and/or business relations to hold her accountable and seek redress for the serious harm she has done to his reputation, livelihood, and well-being.

## PARTIES

15. Plaintiff Daniel Ryan is a Maryland citizen, residing at 3038 St. Paul Street, Apt. 1, in Baltimore, Maryland.

16. Mr. Ryan is a professional musician and has been a member of a number of bands, including bands based in Maryland.

17. Mr. Ryan works primarily from Baltimore, Maryland.

18. Defendant Ashlyn Brooke Anderson is a New York citizen, residing at 448 E. 28th Street, Floor 2, in Brooklyn, New York.

19. On information and belief, Ms. Anderson is a professional singer and actress.

## JURISDICTION AND VENUE

20. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because it is between citizens of different States and the amount in controversy exceeds

$75,000, exclusive of interest and costs.

21. This Court has personal jurisdiction over Ms. Anderson pursuant to NY CPLR § 301 because Ms. Anderson is domiciled in New York.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Ms. Anderson resides in this judicial district.

23. Mr. Ryan's claims against Ms. Anderson are governed by Maryland substantive law because Maryland is the state with the most significant interest in this matter as it is the state where the harm to Mr. Ryan's reputation occurred and the state with the most significant relationship to the issues.

## STATEMENT OF FACTS

### Utah Encounter

24. On or about September 1, 2018, Mr. Ryan met Ms. Anderson in Salt Lake City, Utah, where they were working together on a musical, creative project ("Project") with other professional musicians and actors. It was a new rock musical that they would be rehearsing and performing.

25. Although both Mr. Ryan and Ms. Anderson worked on the Project together, they had different roles, and one did not work for the other. Mr. Ryan played guitar in the band. Ms. Anderson's role was as an actress and cast member. Mr. Ryan made no creative or casting decisions related to the Project at any time.

26. While working together on the Project over several days, Mr. Ryan and Ms. Anderson developed a friendship. They had lunch together, attended a jam session at a bar one evening, and got coffee one morning.

27. While working together on the Project, Ms. Anderson acted flirtatiously toward Mr.

Ryan.

28. On or about September 4, 2018, during a multi-hour afternoon break between their final rehearsal and the first performance of the show, Mr. Ryan invited Ms. Anderson to his hotel room.

29. Ms. Anderson accepted Mr. Ryan's invitation and joined Mr. Ryan in his hotel room.

30. Both Ms. Anderson and Mr. Ryan were sober during their entire time in Mr. Ryan's hotel room and did not consume any alcohol or drugs while in the room together.

31. Ms. Anderson and Mr. Ryan were the only individuals in Mr. Ryan's hotel room during their time together there.

32. As they sat together at the table in Mr. Ryan's room, Mr. Ryan said that it felt like they were connecting during their time together in Utah. Ms. Anderson agreed.

33. Mr. Ryan then said to Ms. Anderson, in sum or substance, the following: "The only thing is there is someone I love very much back home who told me if something like this were to happen, she wouldn't want to know about it."

34. Mr. Ryan made clear to Ms. Anderson that he wanted any interaction between them to remain private.

35. Ms. Anderson indicated that she understood.

36. By this point in time, Ms. Anderson knew that Mr. Ryan lived in Baltimore, Maryland.

37. While they were in Mr. Ryan's hotel room, Mr. Ryan asked Ms. Anderson, who had just celebrated her birthday, how old she was. Ms. Anderson responded that she was 25 years old.

38. This was consistent with the way Ms. Anderson had appeared to Mr. Ryan. To Mr. Ryan, Ms. Anderson had seemed mature, worldly, and experienced.

39. In fact, as Mr. Ryan learned later, Ms. Anderson had lied to Mr. Ryan about her age. She had just turned 23, not 25.

40. At the time, Mr. Ryan was 28 years old.

41. Mr. Ryan asked Ms. Anderson if he could kiss her. She responded "yes."

42. As Mr. Ryan and Ms. Anderson's clothes started to come off, Ms. Anderson asked Mr. Ryan if he had a condom. Mr. Ryan responded "yes."

43. While in Mr. Ryan's hotel room, Ms. Anderson and Mr. Ryan proceeded to engage in intense physical interaction, including two acts of consensual, protected sexual intercourse.

44. During their interaction, Mr. Ryan repeatedly checked in with Ms. Anderson before every next thing that they did. At one point, Ms. Anderson even remarked, "You talk a lot."

45. At one point, Ms. Anderson made an unusual facial expression, and Mr. Ryan asked if she was okay. She responded, "Yes, do whatever you want to me."

46. After their first act of consensual, protected sexual intercourse, Ms. Anderson cuddled up to Mr. Ryan on his hotel room bed.

47. Ms. Anderson commented that she wanted to visit Mr. Ryan in Baltimore—a comment that confused him in light of his earlier comment about his girlfriend, Melody, in Baltimore not wanting to know about any interaction like this.

48. According to Ms. Anderson's later account, she remembered saying that she was sad Mr. Ryan was leaving Utah at the end of the Project and wished he lived closer.

49. After becoming aroused again, Ms. Anderson and Mr. Ryan engaged in a second act of consensual sexual intercourse.

50. Mr. Ryan and Ms. Anderson's sexual encounter in Mr. Ryan's hotel room on September 4, 2018, was the one and only time that Mr. Ryan and Ms. Anderson engaged in any physical, sexual interaction or intimate physical contact.

51. Following their second sexual interaction, Ms. Anderson and Mr. Ryan got dressed.

52. Ms. Anderson then drove them to a restaurant where they had lunch together before returning to their work on the Project.

53. Upon returning to the theater where the first performance was to take place, Ms. Anderson stayed very close to Mr. Ryan, which made him uncomfortable since he wanted their intimate interaction to remain private. Thus, Mr. Ryan tried to maintain distance and to be discreet.

54. In light of Ms. Anderson's behavior and much to the dismay of Mr. Ryan, Project members asked if Mr. Anderson and Mr. Ryan were "together."

55. Following the first performance, Ms. Anderson, Mr. Ryan, and other Project participants had dinner together.

56. Following the dinner, Ms. Anderson drove Mr. Ryan to his hotel, where they said goodbye and exchanged a hug outside his hotel.

57. On September 5, 2018, Mr. Ryan and Ms. Anderson's work together on the Project officially ended, and Mr. Ryan returned to his home in Maryland.

58. At no time during their time together in Utah did Ms. Anderson ever complain to Mr. Ryan or indicate any unhappiness about their time together in Mr. Ryan's hotel room, or otherwise.

59. On information and belief, at no time during their time together in Utah did Ms. Anderson complain about Mr. Ryan to any of the other Project participants.

Ryan Learns Anderson Lied About Her Age

60. After the Project ended, Ms. Anderson and Mr. Ryan engaged in ongoing communication, primarily through text messaging.

61. During one of these text exchanges, Mr. Ryan referenced that Ms. Anderson was 25 now. Ms. Anderson, however, corrected him and said that she was actually 23. When Mr. Ryan responded that Ms. Anderson had told her in his hotel room in Utah that she was 25, not 23, Ms. Anderson responded with an emoji of a purple smiling face with horns, symbolizing mischievousness, naughtiness, or playful flirting.

62. Mr. Ryan became concerned that Ms. Anderson had lied to him about her age.

63. As a result, he decided he needed to be very careful in his dealings with Ms. Anderson going forward.

New York Encounter

64. On or about September 21, 2018, Mr. Ryan was scheduled to perform with his band Super City at a venue in Brooklyn, New York.

65. Ms. Anderson texted Mr. Ryan that she was in New York, saw that he would be performing with Super City, and would come to see him.

66. Ms. Anderson came to the venue where Mr. Ryan was performing with Lauren, a mutual friend from the Utah Project.

67. During breaks in Mr. Ryan's performance, Ms. Anderson attempted to get close to Mr. Ryan, while Mr. Ryan tried to maintain space between them and be discreet, in part because he did not want his bandmates, who were friends with his girlfriend Melody in Baltimore, to think that there was something going on between Mr. Ryan and Ms. Anderson.

68. At the end of the evening, Mr. Ryan hugged Ms. Anderson and Lauren goodbye.

69. At no time on September 21, 2018, were Mr. Ryan and Ms. Anderson alone together.

70. At no time on September 21, 2018, did Mr. Ryan and Ms. Anderson have intimate, sexual interaction.

71. Their in-person encounter on September 21, 2018, was the last time Mr. Ryan was with Ms. Anderson in person.

Ongoing Texting Between Anderson and Ryan

72. Following their September 21, 2018 meeting in New York, Ms. Anderson and Mr. Ryan exchanged additional text messages.

73. As part of their text exchanges, Ms. Anderson sent selfies of herself dressed in various outfits and wigs.

74. In one of her texts, Ms. Anderson sent a picture of a romantic vignette she had written in a notebook about their encounter on September 4, 2018 in Mr. Ryan's hotel room.

75. This image made Mr. Ryan uncomfortable given his stated desire to Ms. Anderson to keep things between them discreet.

76. The texts between Ms. Anderson and Mr. Ryan became less frequent as the months passed.

77. At one point, Ms. Anderson mentioned in a text to Mr. Ryan that she had a boyfriend and asked whether "it was okay?"

78. Mr. Ryan was confused by this text because he did not consider himself to be in any type of relationship other than a friendship with Ms. Anderson and therefore did not have any problem with her seeing someone. In fact, Mr. Ryan continued to be involved in a serious relationship with his girlfriend Melody in Baltimore. Thus, he responded to the effect of "why

wouldn't it be okay?"

Ryan Breaks Off Communication with Anderson

79. In mid-September 2019, Ms. Anderson was working in a karaoke bar in Salt Lake City with a woman named Andrea, who happened to be a mutual acquaintance of Mr. Ryan.

80. Ms. Anderson told Andrea about her interaction with Mr. Ryan, including their September 4, 2018 intimate encounter in Mr. Ryan's hotel room.

81. Andrea relayed to a friend, Megan, what Ms. Anderson had told her about Mr. Ryan.

82. Megan, who, at the time, was the girlfriend of Mr. Ryan's Super City bandmate and friend Greg Wellham, told Mr. Wellham what Andrea had told her about Mr. Ryan.

83. On or about September 24, 2019, Mr. Wellham, who was also a friend of Mr. Ryan's girlfriend Melody, confronted Mr. Ryan about what he had indirectly heard about Mr. Ryan's interaction with Ms. Anderson.

84. Mr. Wellham said he had heard from Megan that Ms. Anderson had told Andrea that she had slept with Mr. Ryan, who she described as a "great guy." Mr. Wellham said that Ms. Anderson was speaking at length about Mr. Ryan. Based on what had been conveyed to him, Mr. Wellham told Mr. Ryan that he "must have made a good impression."

85. Mr. Wellham urged Mr. Ryan to tell Melody about Ms. Anderson.

86. On or about September 25, 2019, Mr. Ryan told Melody everything about his interactions with Ms. Anderson.

87. Melody told Mr. Ryan that he must cease all communication with Ms. Anderson, and that both of them needed to block Ms. Anderson on all communication channels, including social media.

88. However, before blocking her, Mr. Ryan decided he should call Ms. Anderson to let her know what was happening.

89. On or about September 26, 2019, Mr. Ryan called Ms. Anderson and told her he needed to stop communicating with her.

90. During their call, Mr. Ryan informed Ms. Anderson that he had informed his girlfriend about what had happened between them in Utah in September 2018, and that he needed to focus now on working on his relationship with his girlfriend.

91. During their call, Ms. Anderson appeared upset and confused. She appeared to think that the relationship between her and Mr. Ryan was more than it was from Mr. Ryan's perspective.

92. After September 26, 2019, Mr. Ryan and Ms. Anderson did not speak to each other again, and did not communicate with each other for another six years.

<u>Anderson Emails Melody</u>

93. In or about March 2025, and more than five years after Mr. Ryan's last communication with Ms. Anderson, Ms. Anderson sent an unsolicited message directed to Melody, Mr. Ryan's girlfriend.

94. A true and correct copy of Ms. Anderson's message to Melody is attached as Exhibit 1.

95. Ms. Anderson sent the message directed to Melody in an email forum on the website BandCamp.com, where a band involving Mr. Ryan and Melody was listed.

96. Because Ms. Anderson sent the message in this manner, Melody did not learn about it and did not receive it until in or about October 2025.

97. In her message, Ms. Anderson made a number of false and defamatory statements about Mr. Ryan, and created an entirely false impression about their interaction during the Project,

during their encounter in New York, and in their text and phone communications in 2018 and 2019.

98. Although Ms. Anderson said in her message to Melody that she "was freshly 23" when she and Mr. Ryan met, she omitted that she had lied to Mr. Ryan about her age, telling him at the time that she was 25.

99. Among other things, Ms. Anderson falsely accused Mr. Ryan of exhibiting behavior that led to an "unfair, disorienting, and unsafe experience."

100. She falsely accused Mr. Ryan of "dishonesty [that] coerced me into both sexual and emotional dynamics I would never have engaged in had I known the truth about your relationship," even though, as she admits, she knew about Mr. Ryan's relationship with Melody from the outset, and was a willing participant in all of their interactions.

101. She falsely accused Mr. Ryan of exploiting "a clear power dynamic" when no such power dynamic existed given that Mr. Ryan was not part of the "creative team," was simply a guitar player in the band, and Ms. Anderson was a cast member. To the extent anyone "exploited" anyone, it was Ms. Anderson who lied about her age to make it more likely that Mr. Ryan would be interested in her, and it was Ms. Anderson who, apparently but incorrectly, believed that cozying up to Mr. Ryan might advance her career.

102. Ms. Anderson falsely described the nature of Mr. Ryan's texts to her.

103. She created a false impression about her attendance at Mr. Ryan's New York show. In fact, Ms. Anderson informed Mr. Ryan that she was in New York and saw that he would be performing. To the extent Mr. Ryan may have "invited" her to attend a show open to the public, it would have been no different than his inviting other members of the Project (or other people he knew) who were in New York at the time to attend as well. It is customary for band members to

invite people they know to concerts to boost attendance.

104. She misleadingly accused Mr. Ryan of “confusing, inconsistent, and shifty behavior” when, in actuality, Mr. Ryan’s repeatedly sought to delicately and politely fend off Ms. Andersons’s advances since he was not interested in being involved with her romantically.

105. In her message, Ms. Anderson said, “I don’t have any intention to cause any more hurt or pain, especially from something that happened so long ago.”

106. However, it appears clear that Ms. Anderson sent her false and defamatory message to Melody about events that happened over five years earlier with the intention of interfering with their relationship and causing hurt and pain to both of them.

107. Notably, in her lengthy message to Melody, Ms. Anderson did not accuse Mr. Ryan of assaulting her or engaging in criminal behavior.

108. Nevertheless, several months later, Ms. Anderson launched a more extensive campaign of lies and smears about Mr. Ryan to Mr. Ryan’s business partners in an attempt to destroy Mr. Ryan’s professional relationships, ruin his reputation, and cause him serious emotional distress.

<u>Anderson Defames Ryan to Super City</u>

109. On or about August 9, 2025, Ms. Anderson sent an unsolicited direct message on Instagram (the “Message”) to Greg Wellham, a member of the Baltimore-based band Super City, of which Mr. Ryan was a member at the time.

110. A true and correct copy of the Message is attached as Exhibit 2.

111. In the Message, Ms. Anderson states, “This is never a comfortable message to send, but I believe you deserve to know so you can make informed choices about your association with Dan.”

112. Ms. Anderson then falsely states, "In 2018, Dan Ryan carefully construed a way to get me alone in a room and assaulted me."

113. At no time, however, did Mr. Ryan assault Ms. Anderson. During their sole intimate episode on September 4, 2018, Mr. Ryan invited Ms. Anderson to his hotel room during an extended break in the Project, and Ms. Anderson readily accepted and voluntarily arrived at his room. There was nothing manipulative about how Ms. Anderson ended up in Mr. Ryan's hotel room.

114. Ms. Anderson then states that Mr. Ryan "was much older than me and had more power while we were working together in a creative environment."

115. In fact, Mr. Ryan was 28 and Ms. Anderson had falsely told Mr. Ryan at the time that she was 25, a mere three-year difference. Ms. Anderson lied to Mr. Ryan about her age since she was actually 23, which Mr. Ryan learned only after the Project had ended. Ms. Anderson omitted her lie about her age from the Message. Nevertheless, at the time, they were both consenting adults.

116. Ms. Anderson falsely indicates that not only did Mr. Ryan have power over her during the Project, but also that he had somehow used that power against Ms. Anderson.

117. In fact, Mr. Ryan did not have any power over Ms. Anderson during this Project as he was not part of the "creative team" under which Ms. Anderson worked as a cast member, but was merely a guitar player in the band.

118. Mr. Ryan did not exert any "power" over Ms. Anderson during the Project.

119. If anything, it appeared that Ms. Anderson was trying to further her own, budding career by developing a close relationship with Mr. Ryan, who she mistakenly believed had a more important role in the Project than he had.

120. Ms. Anderson then states that Mr. Ryan "lied about the nature of his relationship, and after the assault, he kept me in his periphery for over a year, leaning into emotional manipulation whenever I tried to process what had happened or set boundaries."

121. In fact, Mr. Ryan voluntarily disclosed from the get-go that he was in a serious relationship with a girlfriend in Baltimore, and before he and Ms. Anderson had engaged in any physical interaction. He also informed Ms. Anderson that his girlfriend would rather not know about any interaction between them, which was true.

122. Mr. Ryan did not "assault" Ms. Anderson, and Ms. Anderson's outrageous accusation for the first time, almost seven years after the hotel room episode, is entirely false.

123. Ms. Anderson's omission of critical details of the encounter created the false impression that Mr. Ryan had improperly lured her to his room and then sexually assaulted her, when in fact, she voluntarily came to his room, was completely sober at the time, and proceeded to willingly engage—twice—in passionate, consensual sexual intercourse with him.

124. Ms. Anderson also omitted that, after she and Mr. Ryan got dressed in his hotel room, they had lunch together immediately following the alleged assault, and that she continued to cozy up to him that day, and in a subsequent encounter in New York later that month.

125. Ms. Anderson's accusations of "emotional manipulation" and claims of trying to "set boundaries" are also completely false.

126. In fact, Ms. Anderson was an active, willing participant in their communications over the next year, at times clearly indicating her desire for an ongoing relationship with Mr. Ryan. Contrary to her statement, there was no "emotional manipulation" by Mr. Ryan.

127. She then falsely states, "When his lies came to light, he silenced me and created a narrative to protect his image rather than reckon with what he's capable of."

128. Contrary to her implication, Mr. Ryan informed Ms. Anderson at the outset that he was in a serious relationship with a girlfriend in Baltimore.

129. Mr. Ryan did not and could not "silence" her. Rather, he told her from the outset that he wanted to keep their interaction private and that Melody did not want to know about any interaction between them—an understanding that Ms. Anderson betrayed when she shared details of their interaction with Melody and others.

130. He also wanted to limit and end their communications with each other at a later point, which was his prerogative.

131. Ms. Anderson also created the false impression that Mr. Ryan was trying to "protect his image" and took inappropriate action to do so, when there is no factual basis for that.

132. Ms. Anderson then states, "I've decided not to make this public, but to message people who I believe should know," disclosing her desire to interfere with Mr. Ryan's professional and personal relationships with others.

133. Ironically, Mr. Anderson then said: "Sometimes the most dangerous people are unassuming and charming to 99% of people so they can sink their teeth into the 1% they are unsafe to. Unfortunately, in relation to Dan, I was that 1%."

134. In so doing, Ms. Anderson falsely implies that Mr. Ryan had acted unsafely and in a dangerous way toward Ms. Anderson, or had acted in a manner to cause harm to Ms. Anderson. In fact, nothing could be further from the truth.

135. Moreover, Ms. Anderson's actions demonstrate that, based on her calculus, Mr. Ryan appears to have been the 1% that she decided to sink her teeth into.

136. Ms. Anderson also refers to the lack of a "real accountability system for men like this" and that she was reaching out "so conversations can happen that might prevent this from

happening to another young woman," falsely implying that Mr. Ryan had done something wrong in his interaction with Ms. Anderson and was unaccountable in some way, when, in reality, there was nothing in their interaction for him to be accountable for.

137. Finally, she states: "If there was someone capable of this in my orbit I'd want to know. This is not to punish him, but so there's awareness and eyes on the ground, especially around the women he interacts with. He is unsafe, and my life has been permanently altered because I knew him."

138. In so doing, Ms. Anderson falsely implies that Mr. Ryan had done something fundamentally wrong and unsafe toward her and was a danger to other women.

139. In sending this message to someone with whom Ms. Anderson knew Mr. Ryan had a business relationship as a fellow member of Super City, Ms. Anderson sought to improperly and tortiously interfere with that relationship to Mr. Ryan's detriment.

140. Ms. Anderson created a false impression by omitting important facts, including: the consensual nature of their interaction in Utah; her lying to him about her age; that she was an adult at the time; her close interaction with him following the hotel room encounter; her going to see him while he was performing in New York; and her ongoing communication in the months that followed.

141. By omitting these and other important facts, Ms. Anderson created a false impression about what had happened on September 4, 2018, and in Mr. Ryan and Ms. Anderson's subsequent interaction, which ended in September 2019—*six years before* her message to Mr. Wellham.

Anderson Defames Ryan to Planette Automatic

142. On or about August 9, 2025, Ms. Anderson sent an identical, unsolicited direct

message on Instagram to Katie Hackett, a member of Planette Automatic, a Philadelphia band with which Mr. Ryan had an ongoing working relationship at the time.

143. A true and correct copy of this message is attached as Exhibit 3.

144. All the falsehoods identified in the Message to Super City also apply to Ms. Anderson's message to Planette Automatic.

145. Among other things, Ms. Anderson falsely accused Mr. Ryan of assault, and falsely implied that Mr. Ryan had done something fundamentally wrong and unsafe toward her and was a danger to other women.

146. As with her Message to Mr. Wellham, Ms. Anderson omitted important facts, including: the consensual nature of her interaction with Mr. Ryan in Utah; her lying to him about her age; that she was an adult at the time; and their subsequent communication.

147. In so doing, Ms. Anderson created an entirely false impression about what had happened on September 4, 2018, and in Mr. Ryan and Ms. Anderson's subsequent interaction, which ended in September 2019—*six years before* her message to Ms. Hackett.

148. In sending this message to someone with whom Ms. Anderson knew Mr. Ryan had a business relationship as a fellow member of Planette Automatic, Ms. Anderson sought to improperly and tortiously interfere with that relationship to Mr. Ryan's detriment.

149. Following receipt of Ms. Anderson's message, Ms. Hackett confronted Mr. Ryan about Ms. Anderson's message.

<u>Anderson Defames Ryan to Bodega</u>

150. On or about August 9, 2025, Ms. Anderson sent an identical, unsolicited direct message on Instagram to Nikki Belfiglio, one of the leaders of the band Bodega, a New York-based band of which Mr. Ryan was a member at the time.

151. A true and correct copy of this message is attached as Exhibit 4.

152. All of the falsities identified in the Message to Super City also apply to Ms. Anderson's message to Ms. Belfiglio.

153. Among other things, Ms. Anderson falsely accused Mr. Ryan of assault, and falsely implied that Mr. Ryan had done something fundamentally wrong and unsafe toward her and was a danger to other women.

154. As with her Message to Mr. Wellham and Ms. Hackett, Ms. Anderson omitted important facts, including: the consensual nature of her interaction with Mr. Ryan in Utah; her lying to him about her age; that she was an adult at the time; and their subsequent communication.

155. In so doing, Ms. Anderson created an entirely false impression about what had happened on September 4, 2018, and in Mr. Ryan and Ms. Anderson's subsequent interaction, which ended in September 2019—*six years before* her message to Ms. Belfiglio.

156. In sending this message to someone with whom Ms. Anderson knew Mr. Ryan had a business relationship as a fellow member of the band Bodega, Ms. Anderson sought to improperly and tortiously interfere with that relationship to the detriment of Mr. Ryan.

157. Ms. Anderson's message also created the false impression that she could have been underage at the time of the September 2018 interaction.

158. In response, Ms. Belfiglio indicated that she considered Mr. Ryan "a collaborator and friend" and found Ms. Anderson's false statements about Mr. Ryan "very disturbing to hear" and "the first we're hearing about this situation and also anything like this about him."

159. Ms. Belfiglio indicated that she considered Ms. Anderson's accusations, which Ms. Belfiglio did not know at the time were false, to be "incredibly serious."

160. Ms. Belfiglio asked about Ms. Anderson's age at the time, the specifics of the

alleged "power imbalance," and the specifics about the "assault."

161. Several days later, Ms. Anderson sent Ms. Belfiglio an email dated August 13, 2025, with the subject "My Account with Dan Ryan," containing a pdf attachment detailing her alleged interactions with Mr. Ryan.

162. A true and correct copy of "My Account with Dan Ryan" by Ms. Anderson is attached as Exhibit 5.

163. Her account contained numerous false statements, false impressions, and omissions that created false impressions.

164. Among other things, Ms. Anderson again falsely accused Mr. Ryan of "assault," when no assault ever took place.

165. Although she refers to her 23rd birthday, she omits that she falsely told Mr. Ryan at the time that she was 25.

166. Her reference to "a bag of newly bought condoms" on the table at which they sat is misleading because what was in the opaque bag did not become known to Ms. Anderson until she asked Mr. Ryan if he had a condom.

167. Her claim that "[h]e was rough with me without checking in with me or my body" is false. As discussed above, Mr. Ryan "checked in with Ms. Anderson at every step of their interaction, to the point that she criticized him for talking so much.

168. Her description of "his energy," interaction with furniture, being "animalistic," and "his roughness" is false.

169. In particular, her claim that he pressed her body "hard" into wooden furniture to the point that it bruised her hip is false. What she appears to be referring to is a point during their intimacy involving an incidental and inadvertent bump into furniture, immediately after which Mr.

Ryan asked if she was okay and Ms. Anderson indicated that she was. They then continued with their intimate encounter as if nothing had happened. At no point afterward did Ms. Anderson even suggest to Mr. Ryan that she was bruised in any way from their interaction.

170. However, Ms. Anderson's description of her digging her nails into Mr. Ryan's back to the point that Mr. Ryan told Ms. Anderson that that was not okay to do is accurate.

171. Thus, to the extent anyone assaulted anyone during their interaction, it was Ms. Anderson who assaulted Mr. Ryan.

172. Ms. Anderson also omitted some important details, highlighted above, and by so doing, created a false impression of what happened.

173. Her statement that Mr. Ryan initiated the texts with Ms. Anderson along with her description of the texts is false.

174. Her statements about Mr. Ryan's inviting Ms. Anderson to his Super City show in New York create a false impression. In fact, Ms. Anderson informed Mr. Ryan that she was in New York and saw that he was performing. To the extent Mr. Ryan may have "invited" her to attend a show open to the public, it would have been no different than his inviting other members of the Project who were in New York at the time to attend as well. Plus, it is customary for Mr. Ryan and his band members to invite people they know to concerts to boost attendance.

175. Her statements about Mr. Ryan's treatment of her that night as if they were dating and his inviting her into the bathroom are false.

176. Her statement that Mr. Ryan gave her a "long hug and whispered in my ear that I should move to the city" is false.

177. Her statement that Mr. Ryan's texts after the New York encounter "ramped up and continued deepening in emotional weight" is false.

178. Her suggestion that she stopped responding to his texts in an attempt to create distance between them and that he responded with a barrage of texts is also false.

179. While her description of telling a mutual acquaintance about their encounter in Utah is generally accurate, her description of Mr. Ryan's response is not. He did not call her nonstop, although he was upset that she was sharing information about their Utah encounter with others, such that it had gotten back to him. Her description of their conversation is not accurate.

180. Her description of Mr. Ryan and Melody's blocking her on social media is accurate.

181. Her statement that "[h]e lied about his relationship to get access to me sexually and then refused to even check in with me to see if I was enjoying that experience," is not only false, but the truth is actually the exact opposite; he disclosed his relationship from the outset, the sexual interaction was mutually consensual, and he checked in with her every step of the way—to the point that she commented that he talked too much.

182. Her statement implying that Mr. Ryan is not a safe person is false.

183. Ms. Belfiglio shared Ms. Anderson's statement with Mr. Ryan.

184. After reading Ms. Anderson's detailed account, Mr. Ryan prepared a response to Ms. Anderson in which he sincerely apologized to the extent he may have misled her in any way about the serious nature of his relationship with Melody and the impact that may have caused her.

185. Notably, Mr. Ryan did not apologize for "assaulting" Ms. Anderson because he never assaulted Ms. Anderson.

186. Ultimately, Mr. Ryan was trying to appease Ms. Anderson to get her to stop defaming him and interfering with his business and personal relationships.

187. Ms. Belfiglio shared Mr. Ryan's response with Ms. Anderson in the hope of bringing closure to this matter. She noted to Ms. Anderson that she believed that Mr. Ryan "is

taking accountability and being honest with his role in it."

188. On or about August 25, 2025, Ms. Anderson informed Ms. Belfiglio that her "hope is that I can close this out in a way that lets me move on and heal, and helps both Bodega and Planette Automatic find paths forward as well."

189. Nevertheless, on or about August 30, 2025, Ms. Anderson sent a final message to Ms. Belfiglio in which she responded aggressively, despite her previously stated desire not to pursue this further and not to punish but to seek self-healing.

190. Although her response was directed to Mr. Ryan, she sent it to Ms. Belfiglio.

191. A true and correct copy of this message is attached as Exhibit 6.

192. In her message, she falsely stated that Mr. Ryan "assaulted me," "[g]roomed me," and "[t]hen erased it."

193. She falsely accused Mr. Ryan of having "committed a crime." She said, "I could press charges, but I have been trying to approach this all in a way that gives you a shred of dignity."

194. In fact, there was nothing Mr. Ryan did that would have given Ms. Anderson a legitimate basis for pressing charges against him.

195. She made clear that her outreach to Melody, representatives of Super City, Planette Automatic, and Bodega was not due to any misunderstanding about the extent of Mr. Ryan's relationship with Melody.

196. And despite her stated desire up to this point to keep this matter private, she implied an intention now to continue to spread her false allegations to others to further harm Mr. Ryan.

197. She told Ms. Belfiglio, "I will continue to tell people who he is and what he put me through."

198. As Ms. Anderson stated in response to Mr. Ryan's letter to her: "You framed your

apology around a white lie about your relationship, but we both know that is not what I reached out about. *I never would have gotten this many people involved* in a white lie like that. What you did is much more sinister." (Emphasis added.)

199. Ms. Anderson's statement about getting "this many people involved" strongly suggests that she disseminated her false and defamatory statements to even more people than those of which Mr. Ryan is even aware.

Anderson Defames Ryan to Cheekface, Others

200. On information and belief, Ms. Anderson sent her August 9, 2025 Message to other recipients in further attempts to defame Mr. Ryan and interfere with his business and personal relationships.

201. In or about the spring of 2026, the band Cheekface asked Bodega to open for them on an upcoming tour, beginning in October 2026. Bodega agreed.

202. On information and belief, thereafter, Ms. Anderson sent her August 9, 2025 Message (or some version of it with the same false and defamatory statements about Mr. Ryan) to representatives of the band Cheekface.

203. On information and belief, Ms. Anderson is an acquaintance of one of the touring musicians with Cheekface and shared with this individual the false statements contained in the August 9, 2025 Message.

204. On information and belief, Ms. Anderson knew that Cheekface was scheduled to go on a national tour with Bodega—the band in which Mr. Ryan played—as the opening act.

205. On information and belief, Ms. Anderson communicated false and defamatory statements about Mr. Ryan to one or more representatives of the band Cheekface with the goal of trying to get Cheekface to drop Bodega as its opening act, or to get Cheekface to get Bodega to

dismiss Mr. Ryan from that band if Bodega wished to tour with Cheekface.

206. On information and belief, as a result of Ms. Anderson's communicating false and defamatory statements about Mr. Ryan to representatives of Cheekface, on or about May 13, 2026, Cheekface terminated Bodega as the opening act on its tour, resulting in serious losses to Bodega and Mr. Ryan.

207. On information and belief, Bodega was informed by representatives of Cheekface that Bodega was being dropped as Cheekface's opening act on the tour because someone had informed Cheekface that there is a member of Bodega who had committed assault.

208. On information and belief, this was a reference to Ms. Anderson's false allegations of assault against Mr. Ryan, that were communicated directly and/or through intermediaries to Cheekface representatives.

<u>Bodega Severs Relationship with Ryan</u>

209. In the aftermath of Cheekface's termination of Bodega as Cheekface's opening act on its upcoming tour, representatives of Bodega became increasingly concerned about the impact Ms. Anderson's accusations could have on Bodega's own upcoming tour and new album release.

210. Although Bodega representatives considered Ms. Anderson's accusations against Mr. Ryan to be false based on not only what Mr. Ryan had told them, but also Ms. Anderson's own detailed account of what she claimed had happened in Utah in September 2018, Bodega and its representatives were nevertheless concerned about the impact Ms. Anderson's false accusations could have on Bodega's success, particularly if Ms. Anderson continued to disseminate her false and defamatory accusations as she threatened.

211. Thus, they informed Mr. Ryan that they were severing their relationship with him such that he would not be included in their upcoming tour, would not be featured on their upcoming

release of a new album on which he played a major role, and would not be included in the band's future activities.

212. Bodega's severing of its relationship with Mr. Ryan had a devastating impact. It caused him not only significant economic harm, including lost income from performances in which he could not participate, but also substantial emotional distress and reputational harm.

Planette Automatic Severs Ties with Ryan

213. Following Bodega's decision, representatives of Planette Automatic also informed Mr. Ryan that they were severing ties with him to mitigate the risk that Ms. Anderson's false and defamatory accusations could have on that band's future success.

214. As with Bodega, Planette Automatic's severing of its relationship with Mr. Ryan had a substantial impact, causing him economic harm, including lost income from performances in which he could not participate, as well as reputational and emotional harm.

215. Ms. Anderson's dissemination of false and defamatory statements and the impact she has had on his career and professional relationships has caused Mr. Ryan severe emotional distress and trauma.

No Improper Action by Ryan Toward Anderson

216. At no time has Mr. Ryan used unlawful force, coercion, or violence against Ms. Anderson, or acted in any way designed to cause bodily injury to her.

217. At no time did Mr. Ryan create a substantial risk of bodily injury to Ms. Anderson.

218. At no time did Mr. Ryan cause substantial bodily injury to Ms. Anderson.

219. At no time has Mr. Ryan assaulted Ms. Anderson or taken any action against her that could reasonably be construed or characterized as an assault.

220. At no time during the events at issue did Mr. Ryan threaten Ms. Anderson in any

way.

221. On information and belief, at no time has Ms. Anderson made a criminal complaint, pressed criminal charges, or taken any legal action against Mr. Ryan with respect to their encounter on September 4, 2018, or any other aspect of their interaction.

222. At no time has any legal action been taken against Mr. Ryan with respect to his encounter with Ms. Anderson on September 4, 2018, or any other aspect of their interaction.

223. On information and belief, the first time Ms. Anderson ever accused Mr. Ryan of "assault" or acting in a criminal manner was in August 2025, almost seven years after their interaction in Utah in September 2018.

224. In fact, all of Ms. Anderson's interactions toward Mr. Ryan from September 1, 2018 through September 26, 2019, were completely contrary to that of someone who had been assaulted, the victim of a crime, "groomed," or treated in an "unsafe" manner.

225. Until Mr. Ryan severed all communications with Ms. Anderson on September 26, 2019, Ms. Anderson acted as one would expect of a friend and/or someone interested in a romantic relationship, and not someone claiming to be a victim of assault, a crime, grooming, or unsafe treatment.

## Demand for Retraction

226. Given the impact Ms. Anderson's false and defamatory accusations were having on Mr. Ryan's reputation, career, livelihood, and well-being, on June 10, 2026, Mr. Ryan, through undersigned counsel, sent a letter to Ms. Anderson demanding that she issue appropriate retractions to those to whom she had already communicated about Mr. Ryan and that she agree to cease and desist from any further defamatory statements about Mr. Ryan to mitigate further harm to Mr. Ryan.

227. On information and belief, Ms. Anderson has not issued any type of retraction of her false and defamatory statements about Mr. Ryan.

228. On information and belief, Ms. Anderson has not agreed to refrain from further defamatory communication about Mr. Ryan, as requested in the letter of June 10, 2026.

<u>Tolling Agreement</u>

229. On August 3, 2026, Mr. Ryan and Ms. Anderson entered into a Tolling Agreement to temporarily stop the running of the statute of limitations of any claims that either might have against the other. A true and correct copy of the Tolling Agreement is attached as Exhibit 7.

230. Under the Tolling Agreement, the parties agreed in paragraph 1 that the "running of any statute of limitations applicable to any claim arising from any litigation brought against one Party by the other Party shall be tolled for a period commencing from [August 3, 2026] through and including September 4, 2026."

231. The parties further agreed in paragraph 2 that on September 4, 2026, "each Party shall have a 30-day grace period to file an action ('Complaint') against the other Party in a court of law."

232. Paragraph 2 further provided that "[i]f the Complaint is filed within the 30-day grace period (including on the 30th day of the grace period), it shall be deemed filed on [August 3, 2026] for purposes of any statute of limitations or other time-based defense."

233. Thus, under the terms of the parties' Tolling Agreement, any Complaint filed on or before October 5, 2026 (since October 4, 2026 is a Sunday) would be deemed filed on August 3, 2026 for purposes of any statute of limitations or other time-based defense.

## COUNT I

**Defamation**

234. Mr. Ryan repeats and realleges each and every allegation contained in paragraphs 1 through 233 as if set forth in this Count.

235. As detailed above, Ms. Anderson published numerous false and defamatory statements to third parties about Mr. Ryan that caused reputational injury, economic injury, and emotional distress.

236. In particular, Ms. Anderson published false and defamatory statements on or about August 9, 2025, to representatives of the bands Super City, Planette Automatic, and Bodega, and in subsequent communications to Ms. Belfiglio of Bodega.

237. Ms. Anderson published the statements to representatives of Super City, Planette Automatic, and Bodega—bands in which Mr. Ryan was a member—with the intention of causing injury to Mr. Ryan's reputation and relationship with these bands, their members, and the broader music community in which he worked.

238. On information and belief, Ms. Anderson made similar false and defamatory statements about Mr. Ryan to others on or after August 9, 2025, including to representatives of the band Cheekface.

239. In particular, Ms. Anderson falsely accused Mr. Ryan of assault, which is a crime, making her false statements defamatory *per se*.

240. Ms. Anderson also published false and defamatory statements to Mr. Ryan's girlfriend Melody that were first received and seen by Melody in October 2025.

241. Ms. Anderson published false and defamatory statements to Melody with the intention of causing injury to Mr. Ryan's reputation, relationship with Melody, and overall well-

being.

242. Ms. Anderson's false statements about Mr. Ryan were also defamatory *per se* because the words that Ms. Anderson used imputed the defamatory character of what she was saying.

243. Ms. Anderson's false statements about Mr. Ryan caused his standing in the community to suffer and his reputation to be harmed.

244. Ms. Anderson's false statements were of and concerning Mr. Ryan because the false statements either identified Mr. Ryan by name or because Mr. Ryan was readily identifiable as the subject by the recipients of the false statements.

245. As described above, Ms. Anderson's false statements implied the existence of undisclosed defamatory facts, making them defamatory for this reason as well.

246. As described above, Ms. Anderson published these statements about Mr. Ryan with knowledge that they were false or with reckless disregard as to whether they were true or false, and in bad faith.

247. In particular, Ms. Anderson published statements accusing Mr. Ryan of assault and criminal behavior when she knew that Mr. Ryan had never assaulted her and had not engaged in any criminal conduct toward Ms. Anderson.

248. As described above, Ms. Anderson also omitted critical facts in her defamatory statements, creating false and defamatory implications about Mr. Ryan.

249. In particular, Ms. Anderson omitted the fact that: she had lied to Mr. Ryan about her age; they were both consenting adults at the time of their sexual interaction; they engaged in two acts of consensual sexual intercourse; immediately after their interaction in Mr. Ryan's hotel room, they had lunch together; Ms. Anderson continued to pursue Mr. Ryan romantically after

their sexual interaction; Ms. Anderson continued to cozy up to Mr. Ryan in Utah and, weeks later, in New York; their friendship continued for a year thereafter; Ms. Anderson never complained about Mr. Ryan's treatment of her until many years after their sexual encounter; and a year after her interaction with Mr. Ryan, Ms. Anderson described that interaction to a mutual acquaintance in only a positive light.

250. In the alternative, Ms. Anderson published her false and defamatory statements about Mr. Ryan negligently and failed to exercise the requisite standard of care to determine their truth before publishing them.

251. Ms. Anderson's false and defamatory statements about Mr. Ryan have caused him substantial damage, including injury to his reputation, financial and economic interests, mental and emotional state, and overall well-being.

252. As described above, Ms. Anderson's actions have caused two bands with which Mr. Ryan had been associated to sever their ties with him such that he can no longer perform with these bands and participate in other activities with them.

253. Ms. Anderson published these false and defamatory statements with actual and common-law malice because she knew that the statements were false at the time that she published them, and that she published them deliberately because she wanted to harm Mr. Ryan in any way that she could.

254. Ms. Anderson refused Mr. Ryan's demand for a retraction and to cease and desist because, on information and belief, she sought to harm him or was recklessly indifferent to the harm caused by her actions, and did not want to mitigate the harm she had caused.

255. Ms. Anderson's refusal to retract and cease and desist is further evidence of her actual and common-law malice toward Mr. Ryan.

256. Because Ms. Anderson acted knowingly and maliciously in making these false allegations against Mr. Ryan, Ms. Anderson should be subject to punitive damages for her actions.

## COUNT II

### Wrongful Interference with Contractual or Business Relations

257. Mr. Ryan repeats and realleges each and every allegation contained in paragraphs 1 through 256 as if set forth in this Count.

258. As alleged above and as reflected in her communications, Ms. Anderson knew of Mr. Ryan's existing business relationships with the bands Super City, Planette Automatic, and Bodega, when she sent her August 9, 2025 Message about Mr. Ryan to representatives of each of these bands.

259. On information and belief, Ms. Anderson knew of Bodega's upcoming tour with Cheekface when she communicated with one or more representatives of Cheekface about Mr. Ryan.

260. As detailed above, Ms. Anderson falsely accused Mr. Ryan of assault and other bad behavior to representatives of Super City, Planette Automatic, and Bodega, and, on information and belief, Cheekface.

261. Ms. Anderson made these false accusations with knowledge that they were false or with reckless disregard for whether her statements were true or false.

262. Ms. Anderson made these false accusations for the purpose of interfering with Mr. Ryan's professional and personal relationships with: Greg Wellham, Katie Hackett, Nikki Belfiglio; their respective bands Super City, Planette Automatic, and Bodega; on information and belief, Cheekface; and, on information and belief, others in the music community in which Mr. Ryan worked as a professional musician.

263. Ms. Anderson made these false accusations for the purpose of inducing the recipients to sever their relationships with Mr. Ryan, and/or for the purpose of causing economic harm to Mr. Ryan.

264. Ms. Anderson also threatened to continue to disseminate her false and defamatory statements about Mr. Ryan to further induce Super City, Planette Automatic, Bodega, and Cheekface to sever their ties with Mr. Ryan.

265. Ms. Anderson had no justifiable cause or right to make these false accusations against Mr. Ryan and made her false accusations with malice.

266. In fact, the reason Ms. Anderson engaged in this improper action was because she sought to harm Mr. Ryan and cause these bands to terminate their relationships with Mr. Ryan, after Mr. Ryan ended his relationship with Ms. Anderson and continued his relationship with Melody.

267. As a result of Ms. Anderson's communications, Planette Automatic and Bodega severed their relationships with Mr. Ryan and, on information and belief, Cheekface terminated Bodega as its opening act for its upcoming tour, further harming Mr. Ryan's relationship with Bodega.

268. Ms. Anderson's actions caused injury to Mr. Ryan, including economic harm, emotional distress, mental anguish, and out-of-pocket expenses in addressing these false allegations, as well as injury to his reputation and other interests.

269. Moreover, because Ms. Anderson acted knowingly and maliciously in making these false allegations against Mr. Ryan, Ms. Anderson should be subject to punitive damages for her actions.

For these reasons, Mr. Ryan demands judgment against Ms. Anderson in an amount to be determined at trial as follows:

1. compensatory damages in excess of $450,000;
2. punitive damages in excess of $450,000;
3. together with interest, costs, and other expenses, and such other relief as may be appropriate under the circumstances.

Dated: October 1, 2026

Respectfully submitted,

*/s/David S. Wachen*

David S. Wachen
WACHEN LLC
11605 Montague Court
Potomac, MD 20854
(240) 292-9121
Fax (301) 259-3846
david@wachenlaw.com

*Counsel for Plaintiff Daniel Ryan*

**DEMAND FOR JURY TRIAL**

Plaintiff Daniel Ryan demands a trial by jury.

*/s/David S. Wachen*
David S. Wachen